**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERITAGE FOUNDATION., 214 Massachusetts Ave. N.E. Washington, D.C.  20002 )))))) | |
| MIKE HOWELL 214 Massachusetts Ave. N.E. Washington, D.C.  20002 )))))) | |
| *Plaintiffs*, )) | |
| v. ) | Case No. 23-cv-238 |
| U.S. SECURITIES AND EXCHANGE COMMISSION 100 F. St., N.W. Washington, D.C.  20549 ))))))) | |
| *Defendant*. )) | |

## COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs THE HERITAGE FOUNDATION and MIKE HOWELL (collectively "Plaintiffs") for their complaint against Defendant SECURITIES AND EXCHANGE COMMISSION ("SEC") allege on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the production of information related to a SEC proposed rule, *The Enhancement and Standardization of Climate Related Disclosures for Investors*, 87 Fed. Reg. 21,334 (Apr. 11, 2022) ("Proposed Climate Change Rule") (Exhibit 1).

2.      The Proposed Climate Change Rule is immensely controversial.  Both the Proposed Climate Change Rule itself and its supporters claim it is a simple continuation of

longstanding SEC practice.  As the argument goes, the SEC has long worked to ensure that investors have access to standardized disclosure of information that is material to their investments.  The supposed "risk" from "Climate Change" has become so material to investments that standardized disclosure is necessary.  That is all the Proposed Climate Change Rule does.

3.      The opposition sees a different world.  The SEC lacks power to promulgate a Proposed Climate Change Rule masquerading as a matter of prudential regulation.  The Proposed Climate Change Rule does away with the long-established framework of principles-based materiality by imposing a requirement to disclose information that is not material to an investor's core financial decision about an investment.  It will likely introduce inconsistent disclosures because it requires companies to disclose not an easily calculable financial metric such as EBIDTA, but to vaguely speculate on the carbon footprint of their downstream supply chain. Finally, the costs are immense and unjustified, and the potential damage to the economy is vast.

4.      The purpose of Plaintiffs' lawsuit is not to take sides in this dispute, but rather to gather and make public information to allow Americans to evaluate and judge the dispute for *themselves*.  The critiques of the Proposed Climate Change Rule appear to raise substantial questions.  That alone justifies providing the public more information on the Proposed Climate Change Rule and its creation.  But Plaintiffs' FOIA Request has gone unanswered. ("Request" or "Plaintiff's FOIA Request") (Exhibit 2).  Moreover, both the then House Oversight and Reform Committee Minority, the Senate Banking Committee Minority and the then House Financial Services Committee Minority have asked the SEC for information regarding the Proposed Climate Change Rule to enable those Committees to evaluate it.  To Plaintiffs' knowledge they have not received anything actually responsive to those requests.

## PARTIES

5.      Plaintiff, The Heritage Foundation is a Washington, D.C.-based nonpartisan public policy organization with a national and international reputation whose mission is to "formulate and promote public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense." Heritage Foundation, *About Heritage*, https://www.heritage.org/about-heritage/mission (last visited Jan. 23, 2023).  Heritage is a not-for-profit section 501(c)(3) organization which engages in substantial dissemination of information to the public.  Heritage operates a national news outlet, *The Daily Signal*.

6.      Plaintiff Mike Howell leads The Heritage Foundation's Oversight Project and is an author for *The Daily Signal*.  The Oversight Project is an initiative aimed at obtaining information via Freedom of Information Act requests and other means in order to best inform the public and Congress for the purposes of Congressional oversight.  The requests and analysis of information is informed by Heritage's deep policy expertise.  Several Heritage subject matter experts have published analyses of the Proposed Climate Change Rule.  *See, e.g.*, Paul Atkins and Paul Ray, *Opinion:  The SEC's Climate Rule Won't Hold Up in Court*, WSJ (July 12, 2022) ("Atkins & Ray Article") (Exhibit 3); Paul J. Ray, *The SEC Should Not Be Setting Climate Policy*, National Interest (June 21, 2022) ("Ray Article") (Exhibit 4); Patrick Tyrrell, *New Rule Would Force Climate Change Reporting Requirements on Most Companies in America*, The Daily Signal (Apr. 19, 2022) ("Tyrrell Article") (Exhibit 5); Nobert Michel, David Burton, and Nicolas Loris, *Using Financial Regulation to Fight Climate Change:  A Losing Battle*, Heritage Report (June 24, 2021) ("Michel Article") (Exhibit 6).

7.      Defendant SEC is a federal agency of the United States within the meaning of 5 U.S.C. § 552(f)(1).

## JURISDICTION AND VENUE

8.      This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) because this action is brought in the District of Columbia and 28 U.S.C. § 1331 because the resolution of disputes under FOIA presents a federal question.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant SEC's principal place of business is in the District of Columbia.

## BACKGROUND

### The Proposed Climate Change Rule and Its Supporters

10.      The Proposed Climate Change Rule begins by recounting the history under which certain climate related issues that directly impact core material financial issues are already governed by disclosure requirements focused on principles based financial metrics and general risk management.  *E.g.*, information on liability from environmental laws regulating discharges of pollutants must be disclosed in the same manner as any other non-speculative and material legal liability.  87 Fed. Reg. at 21,338.  It then states "[t]he proposals set forth in this release would augment and supplement the disclosures already required in SEC filings."  *Id.*  The Proposed Climate Change Rule then presents a substantial amount of data that it says supports the proposition that climate related disclosures that "*voluntarily*" went beyond the foregoing were both inconsistent and did not allow investors to make key comparisons across companies. *Id.* at 21,339 (emphasis added).  This is said to be a major issue, present substantial risk to investors, and hinder market operation.  *Id.*

11.     Continuing on, the Proposed Climate Change Rule turns to what it labels: "Growing Investor Demand for Climate-Related Risk Disclosure and Related Information."  *Id.* at 21,340.  This section highlights data that is said to show not only general investor concern with a lack of standardized climate disclosures, but with a lack of information needed to "satisfy investor interest in investments that are considered 'sustainable.'"  *Id.*  There is limited explanation of how a desire for *sustainable* investment interacts with the traditional principles-based definition of materiality which focuses only on standard *financial* metrics.

12.     The Proposed Climate Change Rule then surveys calls for comprehensive climate related disclosures from a number of international groups.  *Id.* at 21,340–45.  The Proposed Climate Change Rule makes clear it views these international proposals in a positive light.  *Id.*

13.     Turning to the specifics of the Proposed Climate Change Rule, it:

> [W]ould require a registrant to disclose certain climate related information, including information about its climate-related risks that are reasonably likely to have material impacts on its business or consolidated financial statements, and GHG emissions metrics that could help investors assess those risks.  A registrant may also include disclosure *about its climate-related opportunities.*

*Id.* at 21,345 (emphasis added).  Additional disclosure would be required via:

> [C]ertain climate-related financial statement metrics and related disclosure to be included in a note to a registrant's audited financial statements.  The proposed financial statement metrics would consist of disaggregated climate related impacts on existing financial statement line items.  As part of the registrant's financial statements, the financial statement metrics would be subject to audit by an independent registered public accounting firm, and come within the scope of the registrant's internal control over financial reporting (''ICFR'')

*Id.*  Even more reporting requirements would be imposed on accelerated filers or large accelerated files as it relates to "attestations" concerning "certain proposed GHG emission metrics disclosures."  These requirements would in turn be subject to phase-ins, safe harbors, and small business exceptions.

14.     The Proposed Climate Change Rule summarizes its required disclosures as follows:

- The oversight and governance of climate-related risks by the registrant's board and management;

- How any climate-related risks identified by the registrant have had or are likely to have a material impact on its business and consolidated financial statements, which may manifest over the short-, medium-, or long-term;

- How any identified climate-related risks have affected or are likely to affect the registrant's strategy, business model, and outlook;

- The registrant's processes for identifying, assessing, and managing climate-related risks and whether any such processes are integrated into the registrant's overall risk management system or processes;

- The impact of climate-related events (severe weather events and other natural conditions as well as physical risks identified by the registrant) and transition activities (including transition risks identified by the registrant) on the line items of a registrant's consolidated financial statements and related expenditures, and disclosure of financial estimates and assumptions impacted by such climate-related events and transition activities.

- Scopes 1 and 2 GHG emissions metrics, separately disclosed, expressed:

  - Both by disaggregated constituent greenhouse gases and in the aggregate, and

  - In absolute and intensity terms;

- Scope 3 GHG emissions and intensity, if material, or if the registrant has set a GHG emissions reduction target or goal that includes its Scope 3 emissions; and

- The registrant's climate-related targets or goals, and transition plan, if any.

*Id.* at 21,345.  Scope 1, 2, and 3 GHG emissions are defined terms imported from the "Greenhouse Gas Protocol" which the Proposed Climate Change Rule explains "was created through a partnership between the World Resources Institute and the World Business Council for Sustainable Development, which agreed in 1997 to collaborate with businesses and NGOs to create a standardized GHG accounting methodology." *Id.* at 21,344.  That document's definitions adopted by the Proposed Climate Change Rule provide:

Scope 1 emissions are direct GHG emissions that occur from sources owned or controlled by the company.  These might include emissions from company-owned or controlled machinery or vehicles, or methane emissions from petroleum operations.  Scope 2 emissions are those emissions primarily resulting from the generation of electricity purchased and consumed by the company.  Because these emissions derive from the activities of another party (the power provider), they are considered indirect emissions.  Scope 3 emissions are all other indirect emissions not accounted for in Scope 2 emissions.  These emissions are a consequence of the company's activities but are generated from sources that are neither owned nor controlled by the company.  These might include emissions associated with the production and transportation of goods a registrant purchases from third parties, employee commuting or business travel, and the processing or use of the registrant's products by third parties.

*Id.* at 21,344–45.  Finally, the Proposed Climate Change Rule's disclosures are to be phased in over time.  *Id.* at 21,346.

15.     The Proposed Climate Change Rule was approved by a 3–1 vote of the SEC on March 21, 2022.  SEC Chair Gensler, Commissioner Caroline A. Crenshaw, and Commissioner Allison Herren Lee voted in favor.  Commissioner Hester M. Peirce dissented.

16.     The SEC majority all explained their vote by stating that the Proposed Climate Change Rule was simply an exercise in extending traditional principles requiring disclosure of material information to changing times.  *See* Statement of Chairman Gary Gensler, at 1 (Mar. 21, 2022) (Exhibit 7) ("Over the generations, the SEC has stepped in when there's significant need for the disclosure of information relevant to investors' decisions.  Our core bargain from the 1930s is that investors get to decide which risks to take, as long as public companies provide full and fair disclosure and are truthful in those disclosures.  That principle applies equally to our environmental-related disclosures, which date back to the 1970s. . . . Today's proposal would help issuers more efficiently and effectively disclose these risks and meet investor demand, as many issuers already seek to do.") (Exhibit 8); Statement of Commissioner Alisson Herren Lee, at 1 (Mar. 21, 2022) ("Maintaining an effective disclosure regime for public companies is among the most important and foundational roles of the Commission.") (Exhibit 9); Statement of

Commissioner Caroline A. Crenshaw, at 1 (Mar. 21, 2022) (Exhibit 10) ("As a Commissioner, it is not my job to decide for millions of investors what information is material to them.  Rather, it is my job to listen and engage with investors and the markets.  It's to protect investors and to help ensure the fair and efficient allocation of resources.").

17.     All of the statements went on to explain this position at length.  They viewed the Proposed Climate Change Rule not as a social agenda, but as a routine response to specific investor demands for climate change disclosures.  Part of this routine response was said to be simply striving to standardize inconsistent existing voluntary disclosures put out by many corporations.  *See* Statement of Chair Gensler at 1; Statement of Commissioner Lee at 1–2; Statement of Commissioner Crenshaw at 1–2.  The statements also all specifically emphasized that investors had called for such disclosures.  *See* Statement of Chair Gensler at 1 ("Today, investors representing literally tens of trillions of dollars support climate-related disclosures because they recognize that climate risks can pose significant financial risks to companies, and investors need reliable information about climate risks to make informed investment decisions."); Statement of Commissioner Lee at 2 ("It is no surprise then that investors representing tens of trillions of dollars—more than the combined GDP of the top five ranked countries in the world—have been clear that they need more and better climate-related disclosure"); Statement of Commissioner Crenshaw at 2 ("Investors have noted that GHG emissions disclosures are material and necessary in their capital allocation and voting decisions.").

18.     Commissioner Lee took pains to support her vote by emphasizing what she viewed as the magnitude and import of climate related risk.  *See* Statement of Commissioner Lee at 1 ("This is a watershed moment for investors and financial markets as the Commission today

addresses disclosure of climate change risk—one of the most momentous risks to face capital markets since the inception of this agency.  The science is clear and alarming, and the links to capital markets are direct and evident.").  Commissioner Crenshaw in turn highlighted that the Proposed Climate Change Rule would bring the United States into accord with "other jurisdictions and independent bodies" whom Commissioner Crenshaw viewed as "hav[ing] made significant strides to provide investors and companies with a basic framework for climate-related disclosures, for too long we have left the U.S. markets to rely solely on outdated and outmoded guidance."  Statement of Commissioner Crenshaw at 1.

## Criticism of the Proposed Climate Change Rule

19.     Commissioner Peirce dissented at length and many of her criticisms were echoed and joined by experts in the field, including some at Heritage.

20.     Commissioner Peirce began her dissent by arguing that the Proposed Climate Change Rule "turns the disclosure regime on its head."  Statement of Commissioner Hester Peirce, at 1 (Mar. 21, 2022) (Exhibit 11).  All existing disclosure regimes operate under a "principles-based" metric and hence are designed to "elicit tailored information from companies" based on what the companies' "managers" see as relevant to the companies' financials.  *Id.* at 1–2.  By following this principles-based approach that does not focus on any one substantive issue, be it climate change or exposure to the Chinese regime, "[f]inancial statements and their accompanying disclosure documents are intended to present an objective picture of a company's financial situation."  *Id.* at 2.  Necessarily, the current disclosure regime includes climate related information where it is a material and objective financial metric—for example, potential liability from pollution must be disclosed as a litigation risk just as any other cause of material litigation risk is disclosed.  *Id.*; *accord* Michel Article at 8 ("To the extent climate-change risk disclosure is

actually material it currently must be disclosed").  Commissioner Peirce noted that under the existing disclosure rules some climate information is disclosed, but when SEC staff pushed for additional climate disclosures, companies "generally . . . stated that the requested disclosures by SEC staff were largely immaterial and inappropriate for inclusion in SEC filings."  Statement of Commissioner Peirce at 2.  Put simply, the argument goes the Proposed Climate Change Rule is not necessary and thus can only do harm.

21.     Commissioner Peirce continued by explaining that the reason the existing rules are principles based and do not focus on a specific risk—such as exposure to lawless regimes like China or Russia—is that they all revolve around the core concept of materiality.  Materiality is a longstanding concept under the SEC's organic statutes and regulations under which "an item is material if there is a substantial likelihood that a reasonable investor would consider the information important in deciding how to vote or make an investment decision."  *Id.* at 3. Critically, materiality's "reasonable investor" is one focused on "a *financial* return on an investment in the company making the disclosure."  *Id.* (emphasis added).

22.     Commissioner Peirce argued that it is facially implausible to dispute that the Proposed Climate Change Rule clearly does away with materiality—or redefines it in a way that completely changes its meaning—when one reaches an example such as downstream carbon admissions by third-parties in a supply chain.  *Id.* at 3–4.  Again, under the existing SEC disclosure rules when SEC staff sought additional climate disclosures, companies "generally . . . stated that the requested disclosures by SEC staff were largely immaterial and inappropriate for inclusion in SEC filings."  *Id.* at 2.  This criticism is echoed by former Office of Information and Regulatory Affairs Administrator Paul Ray who views the Proposed Climate Change Rule as plainly departing from materiality:  "But the rule would chart a different course,

requiring all companies to disclose their greenhouse gas emissions and much else besides—even when that information does not affect risks and returns."  Ray Article at 4.

23.     What is more, said Commissioner Peirce, the Proposed Climate Change Rule's new "materiality" concept revolves not around an investor seeking profit, but specific investors who "do not necessarily consider risk and return of a particular security in isolation but also in terms of the security's effect on the portfolio as a whole, which requires comparable data across registrants."  *Id.*  This necessarily involves a materiality approach divorced from the traditional approach of the company at issue, "subsidiz[ing]" investors with that approach.  *Id.*  Indeed, as other critics have noted, the Proposed Climate Change Rule goes even further in that it is designed around a concept of materiality determined by firms investing on "so-called environmental, social and governance" grounds, *i.e.*, investing that does not focus on the traditional standard of "financial return," but rather focuses on "financial return" only if that return is generated by investments that are deemed to comply with favored political norms surrounding the environment, social justice, and good corporate governance.  Tyrell Article at 4. Critics further note that even if there were a need to update the definition of materiality, to completely redefine such a core concept in the context of a one-off politically charged rule simply is not good policy.  *See* Michel Article at 9–12.

24.     Commissioner Peirce also argued that the proposed rule was in fact self-defeating:

The proposal optimistically posits that mandatory disclosure of reams of climate information will ensure that all companies disclose comparable, consistent, and reliable climate information in their SEC filings. The proposal does not just demand information about the company making the disclosures; it also directs companies to speculate about the habits of their suppliers, customers, and employees; changing climate policies, regulations, and legislation; technological innovations and adaptations; and changing weather patterns. Wanting to bring clarity in an area where there has been a lot of confusion and greenwashing is understandable, but the release mistakenly assumes that quantification can generate clarity even when the required data are, in large part, highly unreliable.

Statement of Commissioner Peirce at 4–5.  As Commissioner Peirce pointed out, establishing a "physical risk[]" or "[t]ransition risk" is notoriously hard to do.  Those risks are based on any number of predictive outcomes of future events.  And the predictive science is not even certain.  *Id.* at 5.  Heritage's own experts have catalogued in detail the difficulties in formulating accurate "climate models[] and climate risk-assessment models."  Michel Article at 6–8.  Boiled down, critics believe the Proposed Climate Change Rule cannot solve what it views as inconsistent disclosures on climate risk by deploying regulations that will in fact generate even more pronounced uncertainty.

25.   Commissioner Peirce next argued the SEC lacked statutory authority to promulgate the Proposed Climate Change Rule.  As she explained:

> Focusing on information that is material to a company's value proposition not only serves as a key mechanism to winnow out needless volumes of information, but also keeps us from exceeding the bounds of our statutory authorization.  The further afield we are from financial materiality, the more probable it is that we have exceeded your statutory authority. One commentator argues that the rationales relied on by the Commission here—that the "Commission has broad authority to promulgate disclosure requirements that are 'necessary or appropriate in the public interest or for the protection of investors'" or that "promote efficiency, competition, and capital formation"—cannot justify disclosure mandates that lie outside the "subject-matter boundaries" Congress imposed on it.  Indeed, in the rare instances when Congress has wanted us to go beyond those subject-matter boundaries, it has told us to do so.  We do not have a clear directive from Congress, and we ought not wade blithely into decisions of such vast economic and political significance as those touched on by today's proposal.

*Id.* at 6.

26.   The Supreme Court's decision in *West Virginia v. EPA*, making clear that the Court will aggressively enforce the "major questions" doctrine which bars agencies from taking regulatory action to resolve major policy questions without clear Congressional authorization, gives considerable support to this argument.  142 S.Ct. 2587 (2022).  "The SEC's proposed climate disclosure rule would expand its authority in a way that is almost indistinguishable from

the EPA's failed attempt to seize more power than it was due."  Atkins and Ray Article at 1.

"The similarities between the Clean Power Plan and the SEC's proposed disclosure rule are

striking and speak to why both violate the law."  *Id.*  Specifically:

- "Both regulations would impose changes on massive swathes of the American economy."
  *Id.*

- "Both rules also lie beyond the expertise of the issuing agencies."  *Id.* at 2.

- "The SEC proposal, like the Clean Power Plan, asserts a new understanding of an old
  statute to justify itself."  *Id.*

- The SEC proposal, like the Clean Power Plan, would also vastly expand the issuing
  agency's regulatory authority.  *Id.*

- "Finally, the SEC proposal, like the Clean Power Plan, would adopt a measure that
  Congress has already considered and declined to enact."  *Id.*

27.    Commissioner Peirce also argued in dissent that the Proposed Climate Change

Rule would be prohibitively expensive because of its imposition of a host of new and complex

reporting metrics and compliance obligations.  Statement of Commissioner Peirce at 7–8.  As

Administrator Ray noted, "[b]y the Commission's own estimates, the proposal would increase

the cost of yearly corporate disclosures more than all previous SEC rules combined."  Ray

Article at 3.  And under basic economic principles, "[c]ompanies that must bear the rule's costs

would pass them on in the form of lower returns to investors and higher prices for consumers at a

time when Americans can ill afford either."  *Id.*

28.    Finally, Commissioner Peirce dissented on the grounds that the Proposed Climate

Change Rule would likely damage the economy.  First, she argued it acts to the detriment of

"retail" investors, *i.e.*, the average American who buys stock:

> Who then might mind?  Investors.  And by investors, I mean real people who are
> saving for retirement and need to earn real financial—not psychic—returns on their
> money.  When executives focus less on financial metrics and more on other things, the
> financial performance of companies is likely to suffer.  Moreover, the proposal does not

grapple with the potential that retail investors, who are essentially confined to the public markets, should expect to see lower returns over the long term. The logical result of using the financial system as a tool in combatting climate change is to drive down returns on green investments.

Companies that cannot get funding in the public markets will retreat to the private markets, where they will have to pay investors more for capital. Higher returns will be reserved for the wealthy, who the Commission has granted access to private markets.

Statement of Commissioner Peirce at 9; *see also* Ray Article at 3.

29.     Second, critics submit that the Proposed Climate Change Rule will necessarily divert capital from other—perhaps more beneficial—uses. *See* Statement of Commissioner Peirce at 9; Ray Article at 3. Third, as Administrator Ray notes, the Proposed Climate Change Rule would likely have a heavy impact on small business who will (likely) have some of the Proposed Climate Change Rule's admittedly massive compliance costs passed on to them. *See* Ray Article at 2.

30.     Finally, critics argue that portions of the Proposed Climate Change Rule compel speech in violation of the First Amendment. *See* Ray Article at 4–5.

### Congressional Inquiries

31.     On May 4, 2022, James Comer, the then Ranking Member of the then House Oversight and Reform Committee transmitted a letter to Chairman Gensler attacking the Proposed Climate Change Rule. Letter from the Hon. James Comer to the Hon. Gary Gensler (May 4, 2022) (Exhibit 11) ("HOR Letter"). The HOR Letter explained that the basis for its interest in the Proposed Climate Range Rule was because "[t]he American people have a right to know what, if any, effect the Rule will have on their ability to access affordable goods and services." *Id.* It then went on to opine that the Proposed Climate Change Rule "is another example of the Biden Administration's attempt to extend the reach of the federal government to

promote its radical climate agenda without any consideration of the burden(s) on small businesses." *Id.*

32.     The HOR Letter continued by concluding that the Proposed Climate Change Rule "would represent the largest expansion of SEC authority without a clear legislative mandate from Congress.  This extensive and complicated Rule would be an overly broad expansion of the SEC's authority and contravenes the mission of the agency . . . ." *Id.*  The HOR Letter also noted its strong suspicions that "this Rule appears to be a key part of the Biden Administration's goal, as laid out in Executive Order 14008, of using federal authority to disincentivize investment in traditional energy sources to bolster the green economy despite soaring gas prices—over $4 per gallon." *Id.* at 2.

33.     The HOR Letter then sought a good portion of the same records sought by the Request. *Id.*  To Plaintiffs' knowledge the SEC has not made a meaningful response to the HOR Letter.

34.     On June 15, 2022, all 12 Republican Members of the Senate Banking Committee transmitted a letter to Chairman Gensler that was highly critical of the Proposed Climate Change Rule.  Letter from the Hon. Pat Toomey *et al*., to the Hon. Gary Gensler, at 1 (June 15, 2022) ("Banking Letter") (Exhibit 12).  The Banking Letter opined that the Proposed Climate Change Rule "would require publicly-traded companies to gather and report global warming data, almost none of which is material to a business's finances."  It then indicted the Proposed Climate Change Rule:  "This sweeping, close to 500-page proposed rule is unnecessary and inappropriate, exceeds the SEC's mission and expertise, will harm consumers, workers, and the entire U.S. economy at a time when energy prices are skyrocketing, and hijacks the democratic process in determining U.S. climate policy." *Id.*

35.     The Banking Letter next adopted in detail the argument that the Proposed Climate

Change Rule departed from the established materiality standard and was accordingly entirely

unnecessary:

> It is neither necessary nor appropriate for the SEC to promulgate securities regulations to address global warming.   Federal securities laws already require publicly-traded companies to make extensive disclosures regarding their businesses, properties, legal proceedings, and risk factors.   These disclosures must include any material climate change information and may not be misleading under the circumstances.   In other words, to the extent climate change will have a material impact in any of these areas, companies are already legally required to disclose this information.

*Id.* at 1.   It then went on to discuss that the proponents of increased climate disclosure desire

access to increased disclosures precisely because the information was not financial in nature, but

rather could be used to achieve political objectives:

> While some investors and advocates for more global warming disclosure claim this information would be valuable for investment purposes, non-material disclosures are highly unlikely to have any effect on investment decisions.   Rather, climate activists without a fiduciary duty to a company and its shareholders want this information to aid in their efforts to impose their policy preferences on publicly-traded companies (and the nation at large) after having failed to enact these changes through the legislative process.   Activists will then use this information to run political pressure campaigns against companies to the detriment of shareholders.   This activism is coincidentally aided by some Wall Street asset managers, who claim to be acting on behalf of retail investors.   However, it is important to note that some of these firms' business models rely on developing and selling new climate-oriented investment products with higher fees under the guise of "doing good for the climate" even though such products will do little, if anything, to reduce aggregate global greenhouse gas emissions.

*Id.* at 1.   The Banking Letter next highlighted that the Proposed Climate Change Rule all but

admitted it would impose enormous costs on the economy and particularly energy in a time of

"skyrocketing" prices.   *Id.* at 2.   The Banking Letter continued by raising questions as to the

SEC's legal authority to in-effect wade into "U.S. climate policy."   *Id.*   The Banking Letter then

argued that the Proposed Climate Change Rule is contrary to our constitutional order:

> Unfortunately, the SEC's proposed climate disclosure rule is just the latest example of a financial regulator hijacking the democratic process by straying into a contentious public

> policy issue wholly unrelated to its mission and expertise. Addressing matters like global warming requires political decisions involving tradeoffs. In a democratic society, those tradeoffs must be made by elected representatives, who are accountable to the American people, not unelected financial regulators.

*Id.* The Banking Letter closed by noting that "there appears to be limited transparency concerning communications between SEC staff in the Office of the Chairman and any climate activists before the issuance of the proposed climate disclosure rule." *Id.*

36.     The Banking Letter then sought much of the same information sought by the Request. *Id.* at 2–4. Plaintiffs understand that to date the SEC has not produced any records sought by the Banking Letter.

37.     On September 20, 2022, Patrick McHenry, the then Ranking Member of the House Committee on Financial Services, Kay Granger, the then Ranking Member on the House Appropriations Committee, and James Comer, the then Ranking Member of the House Committee on Oversight and Reform transmitted a letter to SEC Chairman Gensler questioning the legal basis for a number of SEC rulemakings—including the Proposed Climate Change Rule—in light of the Supreme Court's decision in *West Virginia v. EPA*, 142 S.Ct. 2587 (2022). Letter from the Hon. Patrick McHenry *et al.*, to the Hon. Gary Gensler, at 1–2 (Sept. 20, 2022) (Exhibit 13). They requested that the SEC provide the "specific Congressional authority" for, among others, the Proposed Climate Change Rule. *Id.* at 2. Plaintiffs believe no substantive response has been received from the SEC.

38.     On October 7, 2022, the SEC took the extraordinary step of re-opening the comment period for the Proposed Climate Change Rule because of "a technological error that resulted in a number of public comments submitted through the Commission's internet comment form not being received by the Commission. The majority of the affected comments were submitted in August 2022; however, the technological error is known to have occurred as early

as June 2021." SEC Reopens Comment Periods for Several Rulemakings Due to Technological Error in Receiving Certain Comments, 2022-186 (Oct. 7, 2022) (Exhibit 14). This development led to a letter from then Ranking Member McHenry expressing concern over the integrity of the SEC's rulemaking process for several rules including the Proposed Climate Change Rule. Letter from the Hon. Patrick McHenry et al., to the Hon. Gary Gensler (Oct. 16, 2022) (Exhibit 15).

39.     On October 13, 2022, the SEC Office of the Inspector General released its annual report, *The Inspector General's Statement on the SEC's Management and Performance Challenges* (Oct. 13, 2022) (Exhibit 16). That report noted a substantial increase in SEC rulemaking in 2022 and identified "Managing Resources While Meeting the Regulatory Agenda" as a key challenge. *Id.* at 1–2. In pertinent part it noted:

> We met with managers from the SEC's divisions of Trading and Markets, Investment Management, Corporation Finance, and Economic and Risk Analysis, some of whom raised concerns about increased risks and difficulties managing resources and other mission-related work because of the increase in the SEC's rulemaking activities. . . . Others told us that they may have not received as much feedback during the rulemaking process, either as a result of shortened timelines during the drafting process or because of shortened public comment periods. Although no one we met with identified errors that had been made, some believed that the more aggressive agenda—particularly as it relates to high-profile rules that significantly impact external stakeholders—potentially (1) limits the time available for staff research and analysis, and (2) increases litigation risk.

*Id.* at 3.

40.     Based in large part on the foregoing correspondence, Ranking Member McHenry wrote a letter to Financial Services Committee Chairwoman Maxine Waters requesting that Chairman Gensler be invited to testify before the full Committee in November 2022. *See* Letter from the Hon. Patrick McHenry & the Hon. Bill Huizenga to the Hon. Maxine Waters (Oct. 25, 2022) (Exhibit 17). Then Chairwomen Waters did not do so.

41.     On December 4, 2022, then Ranking Member Comer transmitted another letter to Chairman Gensler.  Letter form the Hon. James Comer to the Hon. Gary Gensler (Dec. 4, 2022) (Exhibit 18) ("HOR Letter 2").  HOR Letter 2 reiterated the HOR Letter's indictment of the Proposed Climate Change Rule (*id.* at 2) and stated that in the nearly five months since the HOR Letter was sent the SEC "failed to provide any documents."  *Id.* at 3.  HOR Letter 2 then called the SEC to task for its comment related, workload, and staff attrition issues.  *Id.* at 2. Accordingly, it sought records concerning those issues.  *Id.* at 3.

## PLAINTIFFS' FOIA REQUEST

42.     Plaintiffs submitted their FOIA request on June 22, 2022.  It had two parts.  Part A sought:

> 1) All emails and text messages related to the Proposed Climate Disclosure Rule that were sent between any relevant SEC person and: (1) any individual or entity outside the Executive Branch; (2) any individual in the Executive Office of the President; (3) any individual in an agency that is a member of the Financial Stability Oversight Council; or (4) any individual in the U.S. Environmental Protection Agency.
>
> 2) All calendar entries (including electronic calendars) associated with any relevant SEC person that relate to the Proposed Climate Disclosure Rule and were created or generated.
>
> 3) All records sent, received, or created by any relevant SEC person that contain any of the following key words or key word combinations:
>
>> a. "climate" & "disclos!"
>> b. "sustain!" & "disclos!"
>> c. "climate justice"
>> d. "global warming"
>> e. "green new deal"
>> f. "climate" & "close hold"
>> g. "sustain!" & "close hold"
>
> 4) All analyses related to the costs of the Proposed Climate Disclosure Rule.
>
> 5) Any records related to the First Amendment and the Proposed Climate Disclosure Rule.

Request at 1–2.

Part B sought:

> 1) Records sufficient to show all SEC persons who have worked on the Proposed Climate Disclosure Rule to date.
>
> 2) Records sufficient to show the extent of the costs that are expected to occur in connection with the Proposed Climate Disclosure rule, including, but not limited to, the impact that the proposed rule is expected to have on energy prices.
>
> 3) Records sufficient to show the impact the Proposed Climate Disclosure Rule would have on energy prices or other costs.
>
> 4) Records sufficient to show all other Federal agencies or entities the SEC coordinated with regarding the Proposed Climate Disclosure Rule.

Request at 1. The temporal scope of the Request was January 20, 2021 to the date of the search. *Id.* at 2.

43.    The Request also sought a fee waiver based on Heritage's status as a 501(c)(3) nonprofit, Plaintiffs' non-commercial purpose, Plaintiffs' status as representatives of the news media, and the fact that "requested information is in the public interest and there are multiple articles regarding this proposal." *Id.* at 3.

### SEC's Failure to Adhere to Statutory Timelines

44.    Plaintiffs have not received a response to the Request.

45.    20 working days from July 2, 2022 is August 1, 2022.

46.    30 working days from July 2, 2022 is August 15, 2022.

### FIRST CLAIM FOR RELIEF
### Violation of FOIA, 5 U.S.C. §552
### Failure to Conduct Adequate Searches for Responsive Records.

47.    Plaintiffs re-allege paragraphs 1–46 as if fully set out herein.

48.    FOIA requires all doubts to be resolved in favor of disclosure. "Transparency in government operations is a priority of th[e Biden] . . . Administration." Attorney General,

*Memorandum for Heads of Executive Departments and Agencies: Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

49.     Plaintiffs properly requested records within the possession, custody, and control of Defendant.

50.     Defendant is subject to FOIA and therefore must make reasonable efforts to search for requested records.

51.     Defendant has failed to promptly review agency records for the purpose of locating and collecting those records that are responsive to Plaintiffs' FOIA Request.

52.     Defendant's failure to conduct searches for responsive records violates FOIA and the SEC regulations.

53.     Plaintiffs have a statutory right to the information they seek.

54.     Defendant is in violation of FOIA.

55.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA. Plaintiffs are being denied information to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news. Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

56.     Plaintiffs have no adequate remedy at law.

57.     Plaintiffs have constructively exhausted their administrative remedies.

**<u>SECOND CLAIM FOR RELIEF</u>**
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Withholding of Non-Exempt Responsive Records**

58.     Plaintiffs re-allege paragraphs 1–57 as if fully set out herein.

59.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

60.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

61.     Defendant is subject to FOIA, and therefore must release to a FOIA requester any non-exempt records and provide a lawful reason for withholding any records.

62.     Defendant is wrongfully withholding non-exempt records requested by Heritage by failing to produce any records responsive to Plaintiffs' FOIA Request.

63.     Defendant is wrongfully withholding non-exempt-agency records requested by Plaintiffs by failing to segregate exempt information in otherwise non-exempt records responsive to Plaintiffs' FOIA Request.

64.     Defendant's failure to provide all non-exempt responsive records violates FOIA and SEC regulations.

65.     Plaintiffs have a statutory right to the information they seek.

66.     Defendant is in violation of FOIA.

67.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

68.     Plaintiffs have no adequate remedy at law.

69.     Plaintiffs have constructively exhausted their administrative remedies.

**THIRD CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Denial of Fee Waiver**

70.     Plaintiffs re-allege paragraphs 1–69 as if fully set out herein.

71.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration." *Attorney General, Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

72.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

73.     Defendant has constructively denied Plaintiffs' application for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) & (iii) and 17 C.F.R. §200.80(g)(12).

74.     The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

75.     Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

76.     Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

77.     Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

78.     Plaintiffs have a statutory right to a fee waiver.

79.     Defendant is in violation of FOIA by denying a fee waiver.

80.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied a fee waiver to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

81.     Plaintiffs have no adequate remedy at law.

82.     Plaintiffs have constructively exhausted their administrative remedies.

**FOURTH CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Statutory Bar Against Charging Fees**

83.     Plaintiffs re-allege paragraphs 1–82 as if fully set out herein.

84.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

85.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

86.     The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

87.     Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

88.     Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

89.     Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

90.     Defendant has not determined "more than 5,000 pages are necessary to respond to this request," or discussed with Plaintiffs how Plaintiffs "could effectively limit the scope of the request."  5 U.S.C. § 552(a)(4)(A)(viii)(II)(cc).

91.     Defendant is currently statutorily barred from charging fees related to Plaintiffs' FOIA Request.  Therefore, Plaintiffs have a statutory right to have its request processed without being charged any fees.

92.     Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

93.     Plaintiffs have no adequate remedy at law.

94.     Plaintiffs have constructively exhausted their administrative remedies.

**WHEREFORE** as a result of the foregoing, Plaintiffs pray that this Court:

A.   Order Defendant to conduct a search or searches reasonably calculated to uncover all records responsive to Plaintiffs' FOIA Request;

B.   Order Defendant to produce, within twenty days of the Court's order, or by such other date as the Court deems appropriate, any and all non-exempt records responsive to Plaintiffs' FOIA Request and indexes justifying the withholding of any responsive records withheld in whole or in part under claim of exemption;

C.   Enjoin Defendant from continuing to withhold any and all non-exempt records responsive to Plaintiffs' FOIA Request;

D.   Enjoin Defendant from assessing fees or costs for Plaintiffs' FOIA Request;

E.   Retain jurisdiction over this matter as appropriate;

F.   Award Plaintiffs their costs and reasonable attorneys' fees in this action as provided by 5 U.S.C. § 522(a)(4)(E); and

G.   Grant such other and further relief as this Court may deem just and proper.

Dated: January 27, 2023                     Respectfully submitted,


/s/ Samuel Everett Dewey
SAMUEL EVERETT DEWEY
(No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:  (703) 261-4194
Email:  samueledewey@sedchambers.com

ROMAN JANKOWSKI
(No. 975348)
The Heritage Foundation
Telephone:  (202) 489-2969
Email:  Roman.Jankowski@heritage.org

*Counsel for Plaintiffs*